IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: | : | Chapter 7 |
| AE LIQUIDATION, INC., *et al.*, | : | Bankr. Case No. 08-13031-MFW |
| | : | |
| Debtors. | : | |
| | : | |
| PRUDENTIAL REAL ESTATE AND | : | |
| RELOCATION SERVICES, INC., | : | |
| and PRUDENTIAL RELOCATION, INC., | : | |
| | : | |
| Appellants/Cross-Appellees, | : | |
| | : | Civ. No. 13-1504-LPS |
| v. | : | Civ. No. 13-1505-LPS |
| | : | Adv. Pro. No. 10-55543-MFW |
| JEOFFREY L. BURTCH, Chapter 7 Trustee, | : | |
| | : | |
| Appellee/Cross-Appellant. | : | |

## MEMORANDUM

Pending before the Court is the Prudential[1] Appellants' appeal (D.I. 1)[2] and Jeoffrey L. Burtch's ("the Trustee") cross-appeal (Civ. No. 13-1505, D.I. 1) from the July 17, 2013 Order and Opinion of the United States Bankruptcy Court for the District of Delaware (D.I. 1-1). For the reasons that follow, the Court will affirm in part and remand in part for further consideration.

**I.  BACKGROUND**

In May 2006, Eclipse Aviation Corporation ("the Debtor") engaged Prudential to perform various relocation services for its employees. (D.I. 17 at 3; D.I. 18 at 4) The agreement contemplated that the Debtor would pay Prudential for services within 30 days of receiving an invoice. (D.I. 17 at 3; D.I. 18 at 4) In a typical month, Prudential invoiced the Debtor for

---

[1] Prudential Real Estate and Relocation Services, Inc. and Prudential Relocation, Inc. will be collectively referred to as "Prudential."

[2] Unless otherwise noted, the Court's reference to "D.I. __" will refer to the docket for Civ. No. 13-1504.

hundreds of thousands of dollars of services. (D.I. 18 at 4) During the first year and a half of the parties' agreement, the Debtor paid all invoices within the allotted time. (D.I. 17 at 4; D.I. 18 at 4) Toward the end of 2007, however, the Debtor fell behind on payments. (D.I. 17 at 4; D.I. 18 at 4) Prudential placed the Debtor on "billing review," which implemented the following conditions: (1) Prudential would not accept new employee transfers, (2) the Debtor would begin paying Prudential on a weekly, instead of monthly, basis, (3) the Debtor would pay a $900,000 lump sum to reduce the outstanding accounts receivable balance, and (4) Prudential would eventually terminate the agreement if the conditions were not satisfied. (D.I. 17 at 4; D.I. 18 at 4–5) The Bankruptcy Court refers to this period as the "First Payment Plan." (Adv. Pro. No. 10-55543, D.I. 49 at 2)[3] By January 18, 2008, the Debtor had complied with these terms and Prudential removed the Debtor from the First Payment Plan. (D.I. 17 at 4; D.I. 18 at 5)

In August 2008, Prudential learned that the Debtor had terminated 650 of its employees in light of financial difficulties. (D.I. 17 at 6; D.I. 18 at 6–7) That same month, Prudential again placed the Debtor on billing review due to late payments ("the Second Payment Plan"). (D.I. 17 at 5; D.I. 18 at 5) The Second Payment Plan implemented the same conditions as the First Payment Plan, except for varying payment amounts. On November 25, 2008, the Debtor filed for chapter 7 bankruptcy relief in the United States Bankruptcy Court for the District of Delaware. (Bankr. Case No. 08-13031, D.I. 1)

In the 90 days prior to the petition date, the Debtor had made 12 payments to Prudential totaling $781,702.61. (D.I. 18 at 1) The Trustee filed a complaint against Prudential commencing an adversary proceeding (Adv. Pro. No. 10-55543), alleging that these transfers constituted recoverable preference transfers under 11 U.S.C. §§ 547 and 550. (*Id.*) Following

---

[3] The Court will hereinafter cite to the Bankruptcy Court's Opinion as "(Op. at __)."

2

trial, the Bankruptcy Court entered its Opinion and Order (D.I. 1-1) awarding judgment in favor of the Trustee for $653,323.20. (Op. at 29) This figure represented $781,702.61 of preferential transfers, reduced by $128,379.40 of "new value" that Prudential had provided. (*Id.*; *see* 11 U.S.C. § 547(c)(4)) Both parties filed timely appeals to this Court. (D.I. 1; Civ. No. 13-1505, D.I. 1) After the parties failed to resolve their disputes through mediation, they completed briefing on all outstanding issues on June 10, 2015.[4] (D.I. 17; D.I. 18; D.I. 20; D.I. 21)

## II.     CONTENTIONS

Prudential argues that the Bankruptcy Court erred by rejecting its defense that the Debtor's transfers were not preferential because they occurred in the "ordinary course of business" between the two parties under 11 U.S.C. § 547(c)(2). (D.I. 17 at 1–2) If the Bankruptcy Court had properly applied the factors of the § 547(c)(2) test, Prudential claims, it would have correctly determined that the Debtor's payments were not recoverable as preferential transfers. (*Id.*) In response, the Trustee contends that the Bankruptcy Court did correctly apply these factors to conclude that the subject transfers were not in the ordinary course of business. (D.I. 18 at 2) Prudential requests that the Court reverse the Bankruptcy Court's judgment.

The Trustee cross-appeals on two alleged errors in the Bankruptcy Court's decision. (*Id.* at 3) First, he claims that the Bankruptcy Court miscalculated Prudential's "new value" defense under § 547(c)(4). (*Id.*) In the Trustee's view, the new services that Prudential provided after the Debtor's petition date do not count towards this defense; therefore, the amount of Prudential's new value defense should be $56,571.37 instead of $128,379.40. (*Id.*) Second, the Trustee contends that the Bankruptcy Court abused its discretion by not awarding prejudgment

---

[4] Pursuant to Fed. R. Bankr. P. 8019(b), the Court finds that oral argument is unnecessary because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral arguments.

interest to his judgment, without a justification on the record. (*Id.*) The Trustee requests that this Court remand this matter to the Bankruptcy Court with instructions to enter judgment against Prudential in the increased amount of $725,131.24 (representing a decrease in the new value defense) and further consider awarding prejudgment interest. (*Id.*)

### III. STANDARD OF REVIEW

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. Pursuant to § 158(a)(1), the Court has mandatory jurisdiction over this appeal, which is a final judgment of the Bankruptcy Court. 28 U.S.C. § 158(a)(l). This Court reviews the Bankruptcy Court's findings of fact for clear error and exercises plenary review over questions of law. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). The Court must "break down mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992). "Whether or not a debtor made a particular payment in the ordinary course of business is a factual determination which a reviewing court should not set aside unless it is clearly erroneous." *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 891 F.2d 66, 70 (3d Cir. 1989). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

### IV. DISCUSSION

The Bankruptcy Code empowers the trustee to avoid certain pre-petition transfers of the debtor that are deemed preferential:

> **(b)** Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> **(1)** to or for the benefit of a creditor;

4

> **(2)** for or on account of an antecedent debt owed by the debtor before such transfer was made;
> **(3)** made while the debtor was insolvent;
> **(4)** made--
>> **(A)** on or within 90 days before the date of the filing of the petition; or
>> **(B)** between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> **(5)** that enables such creditor to receive more than such creditor would receive if--
>> **(A)** the case were a case under chapter 7 of this title;
>> **(B)** the transfer had not been made; and
>> **(C)** such creditor received payment of such debt to
>
> the extent provided by the provisions of this title.

11 U.S.C. § 547. On appeal, it is undisputed that all of the conditions for a preference are satisfied. (*See* D.I. 17 at 1; D.I. 18 at 12)

The Bankruptcy Code enumerates nine defenses that a transferee may raise to counteract liability for an otherwise avoidable preference. *See* 11 U.S.C. § 547(c)(1)–(9). Two of these are at issue here: the "ordinary course of business" defense and the "new value" defense.

### A. Ordinary Course of Business Defense

"Even if a payment is considered a preference under Section 547(b), it may not be subject to avoidance if it was made in the ordinary course of business, as defined in 11 U.S.C. § 547(c)." *In re First Jersey Sec., Inc.*, 180 F.3d 504, 512 (3d Cir. 1999). This exception seeks "to leave undisturbed normal financial relations between a debtor and its creditors, even as a company approaches bankruptcy." *Id.* This defense provides that:

> **(c)** The trustee may not avoid under this section a transfer--
>
> **(2)** to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—
>> **(A)** made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>> **(B)** made according to ordinary business terms;

5

11 U.S.C. § 547(c)(2). Prudential contends that the "ordinary course of business" defense under § 547(c)(2)(A) applies in this case as, in Prudential's view, the payments made to Prudential were "made in the ordinary course of business or financial affairs of the debtor and the transferee."

The Bankruptcy Code does not define the phrase "in the ordinary course of business." *See In re Hechinger Inv. Co. of Delaware, Inc.*, 489 F.3d 568, 576 (3d Cir. 2007). Instead, courts have considered the following factors to assess if a transfer occurs in the ordinary course of business:

> (1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to be an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.

*In re Forklift LP Corp.*, 340 B.R. 735, 738–39 (D. Del. 2006).

With respect to these factors, the Bankruptcy Court made the following findings. First, it found that the parties had engaged in a relationship of sufficient length to establish an ordinary course of dealing. (Op. at 13) For the second factor, the Bankruptcy Court emphasized the average length of time the Debtor took to pay Prudential during the preference period as compared to the period before the preference period. (*Id.* at 14) It determined that the Debtor had paid Prudential, on average, 17 days faster (roughly a 40% improvement) during the preference period as compared to the period before the preference period – a factor which weighed against the ordinary course of business defense. (*Id.* at 14–16) Third, the Bankruptcy Court found that the manner in which the Debtor tendered payment did not support an ordinary course defense. (*Id.* at 18) Fourth, the Bankruptcy Court reasoned that the Second Payment Plan

6

reflected unusual collection efforts, which were not in the parties' ordinary course of business. (*Id.* at 19) Finally, the Bankruptcy Court found that Prudential had gained an advantage over the Debtor by implementing the Second Payment Plan after it had learned of the Debtor's financial instability. (*Id.* at 23) Prudential disputes some of these findings on appeal.

### 1. Timing of Payments

Prudential maintains that the Bankruptcy Court erred by finding that the Debtor's faster payments during the preference period supported finding that these transfers were not in the ordinary course of business. (D.I. 17 at 8) In the July 17 Opinion, the Bankruptcy Court reasoned that the decrease in the payment time from an average of 45.3 days to 28 days was significant, especially when coupled with the fact that Prudential had insisted on faster payments. (Op. at 16) (citing Pl. Ex. 23) For this factor, "the Court must compare the transfers in the Historical Period to those in the Preference Period to determine if the transactions were sufficiently similar." *In re Archway Cookies*, 435 B.R. 234, 243 (Bankr. D. Del. 2010) *aff'd sub nom. In re Archway Cookies LLC*, 511 B.R. 726 (D. Del. 2013). "[S]mall deviations in the timing of payments may not be so significant as to defeat the ordinariness of such payments[,] [whereas] courts have held greater deviations in payment timing sufficiently significant to defeat the ordinariness of such payments." *Id.*

Prudential first argues that the Bankruptcy Court erred by rejecting its supporting case law, which provides instances where a court found that a slight deviation in the timing of the payment was not significant. (D.I. 17 at 8) Prudential claims that the Bankruptcy Court incorrectly distinguished those cases on the faulty premise that they all involved slower payment, whereas here, the Debtor paid Prudential faster. (*Id.*) (citing Op. at 15) Prudential points out that in one of its cited cases, *In re Global Tissue, L.L.C.*, 302 B.R. 808, 812 (D. Del. 2003) ("*Global Tissue I*"), the court actually found that a debtor made faster payments which were

7

nevertheless in the ordinary course of business. (*Id.*) Prudential states that the Bankruptcy Court's incorrect distinction warrants reversal.

The Court disagrees. First, the Bankruptcy Court does correctly recognize the facts of *Global Tissue I*. (*See* Op. at 14–15) (noting that debtor in *Global Tissue I* made payments slightly faster during preference period) Second, Prudential mischaracterizes the Bankruptcy Court's reasoning on this point. The Bankruptcy Court did not hold that the payments were outside of the ordinary course of business simply because they were made faster, and not slower, during the preference period. (*Id.* at 15) The Bankruptcy Court found that because the change in the payment timing was significant coupled with the fact that Prudential had "insisted on a quicker payment schedule," the change supported finding the transfers were not made in the ordinary course of business. (*Id.* at 16) The proper inquiry is whether the change in payment timing was significant, regardless of whether it was faster or slower. *See In re Archway Cookies*, 435 B.R. at 243. Here, the Bankruptcy Court found that the 40% increase in payment timing was significant. This was not clearly erroneous.

Prudential argues that the Bankruptcy Court did not take into account certain statistical anomalies in the underlying data. (D.I. 17 at 10) It claims that some extremely late payments in the pre-preference period skewed the average payment time upward during that period. (*Id.*) For support, Prudential relies on *In re Global Tissue L.L.C.*, 106 F. App'x 99, 102 (3d Cir. 2004) ("*Global Tissue II*"). In that case, the Third Circuit rejected the trustee's reliance on the decrease in average payment times. The Court commented that "[t]he Trustee's reliance on the average payment time, as is often the case with statistics, does not portray the complete picture of Global Tissue's payment history." *Id.* The Court instead took a more holistic view of the payment history:

8

> During the first two months of Global Tissue's relationship with the Creditors, all of its payments were extremely late, often 80-98 days after invoice. Those late payments, concentrated primarily in the beginning of the relationship, skewed the average payment time upwards. After two months of significant delinquency, Global Tissue began making payments on a much more timely basis, establishing a history of more prompt payments continuing for the next year.

*Id.* at 103. The Court does not find Prudential's comparison to that case persuasive. In *Global Tissue II*, the "skewed" payments represented two consistent months of extremely late payments, which then leveled off during the remainder of the transactions. *Id.* at 102–03. Here, Prudential points only to six invoices that allegedly skewed the data. (D.I. 20 at 4) The complete preference period, however, includes over 3,500 invoices. (D.I. 17 at 1) The six highlighted invoices fail to demonstrate a consistent pattern of extremely late payments during the pre-preference period, contrary to the facts of *Global Tissue II*.

Prudential also relies on *In re AE Liquidation, Inc.*, 2013 WL 5488476, at *1 (Bankr. D. Del. Oct. 2, 2013). In that case,[5] the Bankruptcy Court found that a preferential transfer was not in the ordinary course of business. *Id.* For the timing of payment factor, the Bankruptcy Court found that a 10 to 15% quicker payment during the preference period was not significant. *See id.* at *4. Prudential attempts to point out an inconsistency because, here, the Bankruptcy Court held that a 40% faster payment time was significant. (D.I. 17 at 11) The Court does not find that this establishes clear error. In fact, there is no inconsistency between finding that a 10-15% increase is insignificant, while a 40% increase is significant. This is especially true given the subjective nature of this determination and the unique facts of each case. *See In re Archway Cookies*, 435

---

[5] This case pertains to a different adversary proceeding within the Debtor's same bankruptcy.

B.R. at 243. The Court determines that the Bankruptcy Court did not err in finding that this factor indicates that the transfers occurred outside the ordinary course of business.

### 2. Taking Advantage of the Debtor

For this factor, the Bankruptcy Court first found that Prudential had knowledge of the Debtor's financially deteriorating situation. (Op. at 23) The record supports this finding, *see* Pl. Ex. 23, and is not contested on appeal.[6] With this knowledge, the Bankruptcy Court concluded that Prudential gained an advantage over the Debtor by insisting on stricter repayment terms while the Debtor was undergoing financial difficulties. (Op. at 24) Prudential claims that when the Debtor began experiencing financial difficulties during the preference period, it instituted the "exact[ ] same four actions" that it had instituted earlier in their relationship. (D.I. 17 at 11) Thus, Prudential insists that it did not act any differently during the preference period than it had when the Debtor had previously fallen behind on payments. Prudential suggests that the Bankruptcy Court incorrectly focused on the degree to which Prudential implemented preference period collection actions; instead, the Court should only have considered if those actions were consistent with the parties' prior relationship. (*Id.*)

Simply because Prudential had imposed stricter payment terms at some earlier point in its relationship with the Debtor, however, does not dictate that these stricter terms were "ordinary." This conclusion is supported by the Third Circuit's decision in *In re Hechinger Inv. Co. of Delaware, Inc.*, 489 F.3d at 578. In that case, the creditor "argue[d] that [an] alteration in terms was not that significant because, previously, the parties had operated under an even more

---

[6] Prudential, however, argues that knowledge of the Debtor's deteriorating financial condition has no significance to this factor. The Court disagrees. *See J.P. Fyfe, Inc. of Florida*, 891 F.2d at 71 (finding significant that creditor had knowledge of debtor's deteriorating financial condition for purposes of ordinary course of business defense).

10

accelerated payment schedule and had used a wire transfer." *Id.* The Third Circuit rejected this argument because the prior alteration in terms was the "result of an unusual dispute regarding some past due invoices and w[as] not the terms employed by the parties during the rest of their fifteen year relationship." *Id.* Similarly, here the parties had established a baseline relationship. (*See* D.I. 17 at 3) These baseline terms continued from the inception of the relationship for more than 18 months. (*Id.* at 4) For several months during the end of 2007, the Debtor fell behind on payments and Prudential implemented the First Payment Plan. (*Id.*) Once the Debtor complied with these terms, Prudential reinstituted the baseline payment terms, which continued from January 2008 until August 2008. (*Id.* at 5) Even if Prudential had implemented stricter repayment terms for some months of the parties' relationship, these terms were not representative of the parties' normal, ordinary arrangement.[7] (Op. at 19–20) Hence, the Bankruptcy Court did not err by finding that this factor did not support an ordinary course of business defense.

Overall, the Bankruptcy Court's conclusion regarding Prudential's ordinary course of business defense depended on the parties' length of engagement, the change in timing of the Debtor's payments, Prudential's collection efforts, and the advantage Prudential gained over the Debtor while the Debtor was financially deteriorating. The Court agrees that the record supports these findings; therefore, the Bankruptcy Court did not commit clear error by denying Prudential's § 547(c)(2) defense.

---

[7] Although Prudential argues that the Bankruptcy Court made an incorrect finding of fact under this element – i.e., that the Debtor's payments in the Second Payment Plan "had the effect of dramatically reducing Eclipse's AR balance" – this finding is not relevant to the Bankruptcy Court's reasoning or this Court's basis for affirming. (D.I. 17 at 13) (quoting Op. at 22)

11

## B. New Value Defense

The Trustee appeals from the July 17 Order to contest the Bankruptcy Court's finding that Prudential established a new value defense under § 547(c)(4) in the amount of $128,379.40. (D.I. 18 at 30) The parties agree that Prudential provided new value during the preference period, but dispute the exact amount. (Op. at 26; *see* D.I. 18 at 27) To determine whether a creditor provided new value, the Third Circuit has set forth the following framework:

> The three requirements of section 547(c)(4) are well established. First, the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b). Second, *after* receiving the preferential transfer, the preferred creditor must advance "new value" to the debtor on an unsecured basis. Third, the debtor must not have fully compensated the creditor for the "new value" as of the date that it filed its bankruptcy petition.

*In re New York City Shoes, Inc.*, 880 F.2d 679, 680 (3d Cir. 1989). The Bankruptcy Court found, based on the testimony of Prudential's Director of Accounting, Rene Williams-Varner, that Prudential had carried its burden to prove that Prudential provided $128,379.40 in new value.

The Trustee specifically disputes that 21 invoices, representing $71,808.03 of Prudential's total $128,379.40 new value award, qualify for this defense. (D.I. 17 at 30) The Trustee argues that these services cannot constitute new value because Prudential provided them after the Debtors' petition date. (*Id.*) He contends that the petition date is the final cutoff point for calculating this defense. To support this proposition, the Trustee cites the third element of the applicable test: that "the debtor must not have fully compensated the creditor for the 'new value' ***as of the date that it filed its bankruptcy petition.***" (*Id.*) (emphasis added) (quoting *Schubert v. Lucent Tech. Inc. (In re Winstar Commc'ns., Inc.)*, 554 F.3d 382, 402 (3d Cir. 2009)).[8]

---

[8] Prudential argues that the Trustee waived this argument by failing to raise it in the Bankruptcy Court. (D.I. 20 at 9) The Court disagrees. In its post-trial brief, the Trustee plainly

12

The Third Circuit has provided guidance on this issue. In *In re Friedman's Inc.*, 738 F.3d 547, 549 (3d Cir. 2013), the Third Circuit analyzed whether a debtor's post-petition payment could reduce a creditor's new value under 11 U.S.C. § 547(c)(4)(B). While § 547(c)(4) provides a "new value" exception that reduces a creditor's preference liability, § 547(c)(4)(B) provides a further exception that reduces the new value defense (and thus increases preference liability). *See* 11 U.S.C. § 547(c)(4)(B) (crediting transferee for new value only "on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor"). Although the holding in *In re Friedman's* pertained narrowly to § 547(c)(4)(B), the Court's reasoning is applicable to § 547 more generally.

*In re Friedman's* established that the cutoff for assessing "an otherwise unavoidable transfer" under (c)(4)(B) is the debtor's petition date. *Id.* at 562. The Court relied on several observations regarding the statutory structure of 11 U.S.C. § 547 as a whole:

> First, as a general matter, § 547 is titled "Preferences," and therefore suggests that it concerns transactions occurring during the preference period, which is by definition pre-petition (i.e., the 90 days before the filing of the petition).
>
> \* \* \*
>
> Second, Appellee urges that the fact that the preference test known as the "hypothetical liquidation test" must be performed as of the petition date points to that date as the cutoff for determining new value. We agree.
>
> \* \* \*
>
> [Third,] [t]he fact that the statute of limitations for a preference avoidance action under § 547 generally begins on the petition date suggests that the calculation of preference liability should remain constant post-petition.

*Id.* at 555–56. This logic applies as well to § 547(c)(4). Most importantly, the Third Circuit noted that "if we allow post-petition payments to affect the preference analysis, it would seem

---

argues that post-petition transfers cannot qualify as new value under § 547(c)(4). (*See* Adv. Case No. 10-55543, D.I. 48 at 19)

13

logical also to consider post-petition extensions of new value to be available as a defense. However, the vast majority of courts that have considered this issue have concluded that new value advanced after the petition date should not be considered in a creditor's new value defense." *Id.* at 557 (collecting cases). Although the Third Circuit did not directly hold that the cutoff date for new value is the petition date, its reasoning essentially accepted that premise in order to further support its conclusion regarding § 547(c)(4)(B). Therefore, the Court concludes that the Trustee is correct that only services provided prior to the petition date are included in the § 547(c)(4) new value defense.

In the July 17 Opinion, the Bankruptcy Court does not distinguish between pre-petition and post-petition payments for the purpose of calculating Prudential's new value defense. It is possible that some of Prudential's new value award included credit for post-petition services:

> Ms. Williams-Varner testified that for household goods insurance, Prudential paid the invoice at the time of closing on the sale of the employee's home. (*Id.* at 106-07.) The invoice to Eclipse for those expenses would take one week after the closing to be generated. (*Id.* at 104.) Thus, Prudential argues that it satisfied its burden under section 547(c)(4) to establish the date of the services for household goods insurance, namely one week before the invoice date. The Court finds the testimony of Ms. Williams-Varner persuasive and uncontested and agrees with Prudential that it has carried its burden of proof regarding its new value defense for those invoices. The Chart lists a payment date of November 20, 2008, for the household goods insurance invoices at issue, which were performed approximately one week before March 5, 2009.

(Op. 26–27) Services provided one week before March 5, 2009 would have occurred after the Debtor's petition date. Accordingly, the Bankruptcy Court's calculation of new value may have erroneously inflated the proper amount of Prudential's new value defense. This matter will be partially remanded for the Bankruptcy Court to reexamine those invoices to determine the appropriate amount of Prudential's new value defense.

14

## C. Prejudgment Interest

The Trustee further argues that the Bankruptcy Court erred by failing to consider his request for prejudgment interest. (D.I. 18 at 31) Denying prejudgment interest is a matter of the Bankruptcy Court's discretion. *See In re Hechinger Inv. Co. of Delaware, Inc.*, 489 F.3d at 574. The Trustee claims that Bankruptcy Court committed reversible error by offering no explanation for why it was not awarding prejudgment interest. (D.I. 18 at 33) Prudential, of course, disagrees. (D.I. 20 at 9–10) It maintains that the Bankruptcy Court has no obligation to state on the record why it is not awarding pre-judgment interest. (*Id.* at 9)

The Trustee relies primarily on *In re Hechinger Inv. Co.* to support its argument. In that case, the Third Circuit reviewed the District Court's affirmance of the Bankruptcy Court's order awarding a $1,004,216 judgment on a § 547 preference claim. *In re Hechinger Inv. Co. of Delaware, Inc.*, 489 F.3d at 571–73. The Bankruptcy Court denied the plaintiff's request for prejudgment interest, but without explanation. *Id.* at 580. The Third Circuit acknowledged that "[t]here is no reference to prejudgment interest in the Bankruptcy Code, but courts have relied on the word 'value' in § 550(a) as authorizing an interest award." *Id.* at 579. It determined that a bankruptcy court's discretion "must be exercised according to law, which means that prejudgment interest should be awarded unless there is a sound reason not to do so." *Id.* at 580. The Third Circuit concluded that because "the Bankruptcy Court gave no reason for its decision to deny [plaintiff's] motion for prejudgment interest[,] [it] therefore c[ould] not determine from the record before [it] whether the Court had a 'sound reason' to deny Hechinger's request." *Id.* Accordingly, the Third Circuit vacated the order of the district court and remanded the case to the Bankruptcy Court to explain its reasons for denying plaintiff's prejudgment interest request.

The Court finds this reasoning directly applicable here and will follow suit. The Court will remand this issue for the Bankruptcy Court to explain its reasoning for denying the Trustee's

15

request for prejudgment interest (i.e., identifying the "sound reason" for denial) or, alternatively, to award such interest.

## V. CONCLUSION

Accordingly, and for the foregoing reasons, the Court will affirm the Bankruptcy Court's July 17 Order and Opinion in part, and remand in part, for further consideration not inconsistent with this Opinion. An appropriate Order follows.

September 10, 2015  
Wilmington, Delaware

HON. LEONARD P. STARK  
UNITED STATES DISTRICT JUDGE